IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

MIKHAILA LENOIR                                                    PLAINTIFF

v.                                              CIVIL ACTION NO. 1:25-CV-38-SA-DAS

COMMUNITY LIVING CENTER
OF WEST POINT, LLC and the
CITY OF WEST POINT, MISSISSIPPI                                    DEFENDANT

ORDER AND MEMORANDUM OPINION

On March 13, 2025, Mikhaila Lenoir initiated this civil action by filing her Complaint [1] against Community Living Center of West Point ("CLC").[1] The Complaint [1] brings claims pursuant to the Americans with Disabilities Act and the First and Fourteenth Amendments, as well as various state law claims. Before the Court is CLC's Motion to Dismiss [12]. The Motion [12] has been fully briefed and is ripe for review. Having considered the parties' filings, as well as the applicable authorities, the Court is prepared to rule.

*Factual Background*

Mikhaila is a quadriplegic resident of CLC.[2] CLC is a nursing home located in West Point, Mississippi.

In 2022, Mikhaila was admitted as a resident of CLC with the assistance of her mother, Stacie Lenoir. Acting in a representative capacity, Stacie entered into an Admission Agreement with CLC on Mikhaila's behalf. Since Mikhaila's admission, Stacie, accompanied by Mikhaila's minor daughter, has frequently visited with Mikhaila at CLC's facility.

---

[1] CLC points out that it has been incorrectly named in this litigation. *See* [13] at p. 1. According to CLC, its correct legal name is "CLC of West Point, LLC d/b/a West Point Community Living Center." *Id*.

[2] Mikhaila's mother, Stacie Lenoir, brings this lawsuit on Mikhaila's behalf acting pursuant to a Power of Attorney. *See* [1] at p. 2, 12.

On August 4, 2024, the West Point Police Department responded to a call regarding a disturbance at CLC. According to the police report from the incident, which is attached to the Complaint [1], the "complainant" was Dorothy Ross, Mikhaila's roommate. [1], Ex. 2 at p. 1. In the police report, the officer describes visiting the facility and fielding complaints from Ross pertaining to Mikhaila. The report also indicates that Mikhaila complained to the officer of threats made against her by Ross.[3] A second police report states that Stacie spoke with Lt. John Langford of the West Point Police Department on August 9, 2024, and complained of Ross' erratic behavior during the August 4, 2024 incident.

Thereafter, on August 18, 2024, while Stacie was visiting with Mikhaila, an employee of CLC, Genevieve Stallings, informed Stacie that she was not supposed to be on the CLC premises. The Complaint [1] alleges that "… nonetheless, Stacie Lenoir continued her visitation with her daughter, Plaintiff Mikhaila Lenoir." *Id.* at p. 4.

Approximately one week later, on August 23, 2024, Stacie and Mikhaila's minor daughter were visiting with Mikhaila at CLC's facility when Stallings called the West Point Police Department. Stallings allegedly told the West Point Police Department that CLC "…was banning Stacie Lenoir from visiting the facility." *Id*. Sergeant FNU Nash responded to the call and, without conducting any investigation into the matter, directed Stacie and the minor child to leave the premises. According to the Complaint [1], Stacie and the minor child returned to CLC the same day in an attempt to visit Mikhaila. CLC again contacted the West Point Police Department. The Complaint [1] alleges that an unnamed representative from the West Point Police Department told Stacie that she was not supposed to be on the property and again directed her to leave.

---

[3] The Complaint [1] contains allegations regarding the incident between Ross and Mikhaila on August 4, 2024. According to the Complaint [1], Ross "began making bizarre threats" against Mikhaila and her minor daughter, and Stacie complained about the threats to the officer. [1] at p. 3. However, the police report from that date does not reference any statement by Stacie to the officer.

On November 22, 2024, a CLC social worker, Heather Parham, told Stacie that she could visit Mikhaila that day. However, when Stacie arrived at CLC's facility at 6:00 PM, an employee of CLC named "Jody" told her that she would only be allowed to visit by appointment between the hours of 8:00 AM and 5:00 PM during weekdays. Stacie, who was accompanied by the minor child on this attempted visit, was directed to leave the premises and she complied.[4]

According to the Complaint [1], Stacie's employment obligations conflict with the allowed visitation times and make visiting Mikhaila "practically impossible." *Id*. at p. 6. The Complaint [1] alleges that "[e]ven when Stacie Lenoir gets advance permission, she has not been allowed to visit." *Id*. Thereafter, on February 14, 2025, Stacie met with CLC's administrator, Rayona Deanes, Parham, and "Ombudsman Thompson" to discuss the visitation hours. *Id*. at p. 7. She was again told that she would have to visit within business hours on weekdays, as previously indicated to her, and that any visitation would be conducted only in the conference room. Stacie expressed her opposition to those visitation parameters because Mikhaila is bedridden and her transfer to the conference room via wheelchair would allegedly cause her pain and potential injury.

A week later, CLC sent Stacie a letter indicating that it would be discharging Mikhaila from its facility.[5] The letter provided Stacie with a 30-day notice of the discharge with the effective date of the discharge being March 30, 2025. As for the reason for this decision, the letter stated that in pertinent part:

> [CLC] is unable to give [Mikhaila] the highest optimal quality of care due to the constant refusal of care, including, but not limited to: proper wound treatment, lab work, psych evaluation, specialist referrals, pharmacy recommendations, dietary recommendations, and safety measures. Moreover, the constant actions have created a

---

[4] The Complaint [1] does not provide any information about what Mikhaila's visitation schedule was prior to the August 2024 incident involving Ross or whether it was any different from what CLC informed Stacie on this date.

[5] The effective date of the notice was February 28, 2025.

3

situation where the facility is unable to meet the needs and expectations of the resident.

[1], Ex. 5 at p. 1.

This lawsuit followed. The Complaint [1] alleges that the West Point Police Department acted jointly with CLC in enforcing the visitation restrictions. It also alleges that the real reason for the visitation changes resulted from CLC's refusal to accommodate Mikhaila's disability. The Complaint [1] brings claims under the ADA, the First and Fourteenth Amendments, and state law against CLC. It also seeks injunctive relief against CLC and the West Point Police Department.

Through the present Motion [12], CLC seeks dismissal of all of Mikhaila's claims asserted against it. The Motion [12] is opposed.

*Dismissal Standard*

Rule 12(b)(6) allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, 129 S. Ct. 1937.

A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F. 3d 228, 232–33 (5th Cir. 2009). But a court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678–79, 129 S. Ct. 1937. A legally sufficient complaint must establish more than a "sheer possibility" that the plaintiff's claim is true. *Id.*, 129 S. Ct. 1937. It need not contain detailed

4

factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. In other words, "[t]his standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citing *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008)). In deciding a motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). If there are insufficient factual allegations to raise a right to relief above the speculative level, the claim must be dismissed. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.

### *Analysis and Discussion*

As noted above, the Complaint [1] brings a number of claims against CLC. Specifically, those claims include: (1) ADA discrimination, (2) violation of associational rights under the First and Fourteenth Amendments, (3) breach of contract, and (4) breach of implied covenant of good faith. The Court will address the claims in turn beginning with the federal claims.

### I.    *ADA Discrimination*

The Complaint [1] alleges that CLC restricted Mikhaila's visitation rights in violation of the ADA. "The ADA prohibits discrimination against persons with disabilities in three, broad sectors: employment, addressed in Title I of the statute; public services, programs, and activities, addressed in Title II; and public accommodations, addressed in Title III." *Hanks v. Olivarez*, 2019 WL 13472193, at *5 (N.D. Tex. May 24, 2019) (citing *Tennessee v. Lane*, 541 U.S. 509, 516-17, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004)). At the outset, the Court clarifies whether Mikhaila's claim is brought pursuant to Title II or Title III of the ADA.

5

In this regard, CLC's status as either a "place of public accommodation" or a public entity is determinative of the law that applies to Mikhaila's ADA claim. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 691-92, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001) ("… Title II [of the ADA] covers discrimination by government entities, and Title III [of the ADA] covers discrimination by places of public accommodation."). The Complaint [1] alleges that "Defendant CLC took joint action along with the City of West Point Mississippi Police Department, thus acting under color of state law. Defendant CLC is also a place of 'public accommodation' within the meaning of the Americans with Disabilities Act." [1] at p. 2. Based on this allegation, it is clear that Mikhaila is pursuing a claim under Title III. However, while the Complaint [1] alleges that CLC was "…acting under color of state law[,]" it does *not* allege that CLC is a public or governmental entity for purposes of her ADA claim.[6]

Title II of the ADA defines a "public entity" as "any State or local government; any department, agency, special purpose district, or other instrumentality of a State or States or local government; and the National Railroad Passenger Corporation, and any commuter authority… ." 42 U.S.C. § 12131(1)(A)-(C). The Complaint [1] is devoid of any facts that would render CLC a public entity as defined by Title II. Other than citing provisions of Title II in her Response Memorandum [18], Mikhaila does not contend that she brings her ADA claim under that title. Accordingly, the Court limits its analysis of the claim to only Title III of the ADA.

"Title III of the ADA provides that 'no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

---

[6] The Court notes that, in her Response Memorandum [18], Mikhaila cites law that is applicable to both Title II and Title III of the ADA. For example, she relies on 42 U.S.C. § 12182(a), which provides that a place of public accommodation may not discriminate against an individual on the basis of disability under Title III. *See* [18] at p. 6. Immediately following that citation, Mikhaila relies on 42 U.S.C. § 12132, which prohibits discrimination by public entities under Title II. *See id.*

advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.'" *George v. Hobby Lobby Stores, Inc.*, 769 F. Supp. 3d 537, 545 (E.D. La. 2025) (quoting 42 U.S.C. § 12182(a)). Under this title, discrimination, as defined by the statute, includes:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

*Id*. (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

Accordingly, "to state a claim under Title III of the ADA, a plaintiff must plead: (1) that [she] has a disability; (2) that the place the defendant owns, leases, or operates is a place of public accommodation; and (3) that [she] was denied full and equal enjoyment because of [her] disability." *Id*. (citing *Castaneda v. Planet Fitness, Inc.*, 2024 WL 4182926, at *4 (W.D. Tex. Sept. 12, 2024)); *see also Gonzales v. H.E. Butt Grocery Co.*, 226 F. App'x 342, 344 (5th Cir. 2007) (citing 42 U.S.C. § 12182(a)).

CLC concedes that the Complaint [1] alleges facts that establish the first two elements; however, it argues that Mikhaila has failed to plead sufficient facts to establish the third element.

As to the third element, CLC argues that "Plaintiff has pled no facts to show that [she] was denied visitors or reasonable accommodations because of her disability or denied visitation rights on the same basis as a non-disabled person due to her disability." [13] at p. 5. In response, Mikhaila points to the allegations in the Complaint [1] related to CLC's alleged failure to allow her to visit with her mother, Stacie, and her minor child. In other words, Mikhaila contends that she was discriminated on the basis of her disability because she was not provided an accommodation that

7

would have permitted her to have the same visitation as other non-disabled residents. In this regard,

the Complaint [1] alleges in pertinent part:

> The real reason Plaintiff is not being allowed to visit with her mother and daughter is that her quadriplegic state requires special accommodations, and because Defendant CLC refuses the reasonable accommodation of placing Plaintiff in a room away from a disorderly and emotionally disturbed patient. The reasonable accommodation of separating Plaintiff from that disorderly and emotional[ly] disturbed patient would have permitted visitation.

[1] at p. 8.

In the same paragraph, however, Mikhaila alleges that she was denied visitation because

CLC had to make accommodations for her:

> Additionally, Defendant CLC has not allowed visitation because Plaintiff's physical disability causes Defendant CLC to have to make special arrangements for Plaintiff's safety during the visitation, which is an accommodation they would not have to make if Plaintiff had not been disabled. In short, Plaintiff's disability is a proximate contributing cause of Plaintiff not being allowed to visit with her immediate family and of Defendant CLC's decision to remove Plaintiff from the facility.

*Id.*[7]

The Court will analyze these allegations separately, beginning with Mikhaila's claim that

CLC refused to place her in a separate room from Ross and then turning to the facts surrounding

the visitation changes.

Relevant to Mikhaila's allegations that CLC refused to separate her from her roommate,

Ross, the Complaint [1] only alleges that "[t]he real reason Plaintiff is not being allowed to visit

with her mother and daughter is that her quadriplegic state requires special accommodations, and

because Defendant CLC refuses…" to move Ross. [1] at p. 8. In short, the Court finds that this

---

[7] The only "special arrangements" alleged in the Complaint [1] are CLC's imposition of visitation parameters for Stacie Lenoir, which Mikhaila argues were "not reasonable" because of Stacie's conflicting work schedule and because Mikhaila is bedridden. [18] at p. 8.

allegation is conclusory. The Complaint [1] does not provide any *facts* that establish a causal connection between Mikhaila's disability and CLC's alleged refusal to separate her from Ross as required by the third element. *See George*, 769 F. Supp. 3d at 545; *see also* 42 U.S.C. § 12182(a). Stated differently, other than this conclusory allegation, the Complaint [1] provides no *facts* to support that CLC's alleged refusal to move Ross to another room was based on Mikhaila's quadriplegic state. Mikhaila has not adequately pled the third element of her ADA claim on this basis.[8]

The Court now considers whether Mikhaila has stated sufficient facts to satisfy the third element of her ADA claim based on the allegations related to the changes to her visitation. As noted above, the Complaint [1] alleges that CLC did not allow Mikhaila visitation "… because Plaintiff's disability causes Defendant CLC to have to make special arrangements for Plaintiff's safety during the visitation, which is an accommodation they would not have to make if Plaintiff had not been disabled." [1] at p. 8. It also alleges that "… Plaintiff's disability is a proximate contributing cause of Plaintiff's [sic] not being allowed to visit with her immediate family and of Defendant CLC's decision to remove Plaintiff from the facility." *Id*. In other words, the Complaint

---

[8] Additionally, for the sake of completeness, the Court notes that Mikhaila attached two police reports to the Complaint [1] (which the Complaint [1] also references) that describe the apparent fallout between her and Ross in August 2024. *See generally* [1], Ex. 2-3. According to the August 4, 2024 police report, CLC's nurse director, Marquetta Roberson, told the responding officer that "…they were going to separate the two of them tomorrow, but she will get someone to move Ms. [Mikhaila] Lenoir to another room tonight so that the arguing will not be an ongoing situation." *Id.*, Ex. 2 at p. 1. As to the second report, it documents a call between Stacie and Lt. John Langford of the West Point Police Department on August 9, 2024. Notably, the August 9, 2024 police report indicates that Stacie referenced the August 4, 2024 incident during the call and further states that "Ms. Lenoir said she reported [Ross] to [the] nursing supervisor. *They have since removed her from the room.*" *Id.*, Ex. 3 at p. 1 (emphasis added). When viewed together, the reports appear to show that CLC did move Ross to another room from the one she shared with Mikhaila following the August 4, 2024 incident. However, the Complaint [1] does not provide any facts about whether Ross was eventually moved to another room other than stating that CLC at some point "refused" to do so. *See* [1] at p. 8. Without more, the Court cannot, at this stage, conclude that the reports contradict the allegations of the Complaint [1]. But, although the Court accepts the allegations of the Complaint [1] as true, the outcome remains unchanged for the reasons provided above.

[1] alleges that CLC made the changes to Mikhaila's visitation because of her disability in violation of the ADA. However, in her Response Memorandum [18], Mikhaila takes a different approach. There, she primarily argues that the restrictions on her visitation were not reasonable and wholly fails to analyze the third element of her ADA claim in the context of this allegation.

Notwithstanding this failure, the Court considers the allegations in the Complaint [1] and finds that the same are conclusory and not otherwise supported by actual facts. It is well established that "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (internal quotation marks and citations omitted). Without more, these allegations do not adequately allege that CLC changed Mikhaila's visitation schedule because of her disability.

In *Stallion*, the District Court for the Western District of Louisiana recently dismissed a plaintiff's public accommodation ADA claim for failure to properly plead the third element of the claim. *Stallion v. St. Francis Med. Ctr.*, 2025 WL 3654170, at *8 (W.D. La. Dec. 8, 2025), report and recommendation adopted, 2025 WL 3669885 (W.D. La. Dec. 17, 2025). In that case, the plaintiff sued a hospital alleging, among other claims, that the hospital "… violated the ADA because they failed to accommodate his disability through less invasive treatments for his [medical condition]." *Id.* at *1. The court found that the complaint failed to sufficiently allege that the hospital discriminated against the plaintiff because of his disability. *Id.* at *8. In doing so, the court held that "[t]he fact that a patient is provided or denied medical care does not in and of itself create a Title III claim merely because the patient happens to be disabled." *Id.* (citing *Smith v. Bastrop Med. Clinic, P.A., Inc.*, 2011 WL 3844223, at *4 (W.D. Tex Aug. 29, 2011; *Davenport v. Walmart, Inc.*, 2025 WL 2301189, at *6 (M.D. La. July 23, 2025)).

Although the facts certainly differ, the same logic applies in this case. The mere fact that Mikhaila has a disability is not enough. The Complaint [1] is devoid of facts to support Mikhaila's argument that her disability triggered the changes to her visitation schedule. Instead, as CLC points out, the Complaint [1] details the incident involving Ross—after which Stacie was told by a CLC employee that she was not supposed to be on its premises—and then the restrictions to visitation followed. *See* [1] at p. 4-5. In sum, the Court finds that Mikhaila has failed to state a claim for discrimination under Title III of the ADA.[9]

Nonetheless, "[w]hen a claim is subject to dismissal under Rule 12(b)(6) for failure to state a claim, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies… unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *City of Starkville, Mississippi v. J&P Constr. Co.*, 2024 WL 4584033, at *4 (N.D. Miss. Oct. 25, 2024) (quoting *Williams v. 1960 Fam. Prac. PA*, 2020 WL 4227592, at *3 (S.D. Tex. June 29, 2020)) (internal quotation marks omitted). Therefore, the Court will allow Mikhaila the opportunity to file an amended complaint setting forth her claim with adequate facts.

II.     *Associational Rights Claim*

Next, the Complaint brings a claim against CLC "… for violating Plaintiff's First and Fourteenth Amendment's associational rights by acting jointly with Defendant City to prohibit

---

[9] The Court is compelled to note that, in her Response Memorandum [18], Mikhaila appears to argue that CLC retaliated against her. Specifically, she argues that "… the real reason Defendant CLC wanted to discharge Plaintiff, and thereby deny her accommodation, was because of her efforts to obtain visitation" and "[t]he issue of whether Defendant CLC was trying to remove Plaintiff due to her asserting her rights under the Americans with Disabilities Act is a fact question." [18] at p. 9. However, the Complaint [1] does not bring a retaliation claim based on the discharge notice and contains no facts linking Mikhaila's disability to CLC's decision to send her a discharge notice. Accordingly, the Court sees no need to further delve into this argument.

visitation." [1] at p. 9. The Court first clarifies whether this claim is properly analyzed under the First or Fourteenth Amendment.[10]

"The Supreme Court has recognized a constitutional right of free association in the context of 'certain intimate human relationships,' *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984), and as a 'derivative of the First Amendment rights of speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *In Int. of N.L.P.*, 2018 WL 2670416, at *4 (E.D. Tex. May 3, 2018), report and recommendation adopted, 2018 WL 2548009 (E.D. Tex. June 3, 2018) (quoting *Hobbs v. Hawkins*, 968 F.2d 471, 482 (5th Cir. 1992)). "The right to familial association or family integrity is a form of liberty guaranteed by the due process clause of the Fourteenth Amendment." *Id*. (quoting *Doe v. Dallas Indep. Sch. Dist.*, 194 F. Supp. 3d 551, 564 (N.D. Tex. 2016)) (in turn quoting *Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir. 1999)) (internal quotation marks omitted). Accordingly, though the Complaint [1] asserts this claim as arising under both the First and Fourteenth Amendments, it is properly analyzed as arising under the Fourteenth Amendment. *See id*; *see also Caston v. Bolivar Cnty., Mississippi*, 2018 WL 2435602, at *8 n.22 (N.D. Miss. May 30, 2018) ("Despite [plaintiff's] suggestion at certain points in her brief that her familial association claim arises under the First and Fourteenth Amendments, the Court declines to construe her familial association claim as arising under both. Family free association implicates only the Fourteenth—not the First—Amendment.").

---

[10] As an aside, the Court notes that the Complaint does not assert this claim as being brought pursuant to 42 U.S.C. § 1983. "Section 1983 imposes liability upon any person who, acting under color of state law, deprives another of federally protected rights." *Mabry v. Lee Cnty.*, 100 F. Supp. 3d 568, 572 (N.D. Miss. 2015) (citing 42 U.S.C. § 1983). "It is axiomatic 'that Section 1983 does not create substantive rights; rather, it merely provides civil remedies for deprivations of rights established under the Constitution or federal laws." *Id*. (citing *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004)). Based on the nature of the allegations, Section 1983 is seemingly the appropriate vehicle for bringing this claim. Given the Court's allowance for Mikhaila to file an amended complaint, she should clarify therein if this claim is being brought under Section 1983.

"To state a claim for deprivation of [her] right to familial association under the Fourteenth Amendment, a plaintiff must generally demonstrate that some 'state action (or inaction) physically separates family members from one another.'" *In Int. of N.L.P.*, 2018 WL 2670416 at *5 (citing *Doe*, 194 F. Supp. 3d at 564). In its Memorandum [13], CLC argues that Mikhaila's association claim fails because CLC is a private entity and not a state actor. In response, Mikhaila does not dispute that CLC is a private entity. However, she contends that, by virtue of an alleged agreement between CLC and the West Point Police Department, CLC engaged in joint activity with a state actor and thus acted under color of state law.

"Under color of state law' excludes from its reach purely private conduct, no matter how discriminatory or wrongful. *Blakely v. Andrade*, 360 F. Supp. 3d 453, 491 (N.D. Tex. 2019) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982)). But the Fifth Circuit has held that "… a non-state actor may be liable under [Section] 1983 if the private citizen was a 'willful participant in joint activity with the State or its agents." *Priester v. Lowndes Cnty.*, 354 F.3d 414, 420 (5th Cir. 2004) (internal quotation marks and citations omitted). In order to prevail against CLC on this theory, Mikhaila must allege: "(1) an agreement between the private and public defendants to commit an illegal act and (2) a deprivation of constitutional rights." *Id*. Again, "[a]llegations that are merely conclusory, without reference to specific facts, will not suffice." *Id*. (citing *Brinkmann v. Johnston*, 793 F.2d 111, 113 (5th Cir.1986).

As to the first prong, Mikhaila's legal argument raised in her Response Memorandum [18] mirrors the allegations in the Complaint [1]. In relevant part, the Complaint alleges:

> The failure to allow visitation was made in conjunction with an agreement with West Point Police Department that originally kept Plaintiff's immediate family from visiting with her. Defendant CLC is able to prohibit the visitation because of the agreement with the West Point Police Department to follow Defendant CLC's directions as to who may be on the premises. The agreement with

13

> West Point Police Department to carry out Defendant CLC's wishes regarding the exclusion of Plaintiff's mother and daughter from visiting her is an unconstitutional agreement in violation of the First and Fourteenth Amendments of the United States Constitution. It also means that Defendant CLC, pursuant to an agreement with the West Point Police Department, has acted under color of state law.

[1] at p. 7-8.

Notably, though the Complaint [1] repeatedly alleges in conclusory fashion that an agreement existed between CLC and the West Point Police Department to allegedly deprive Mikhaila of her visitation, no facts are alleged to demonstrate an agreement actually existed. Accordingly, the Court finds these allegations are merely legal conclusions and/or recitation of elements that are insufficient to state a claim. *See Twombly*, 550 U.S. at 555, 127 S. Ct. 1955; *see also Priester*, 354 F.3d at 420 (affirming district court's dismissal of the plaintiff's Section 1983 claim for failure to state a claim because the complaint failed to allege a conspiracy between a state actor and a non-state actor and reasoning that the complaint did not "… allege specific facts to show an agreement."); *Polacek v. Kemper Cnty., Miss.*, 739 F. Supp. 2d 948, 952 (S.D. Miss. 2010) (explaining that a complaint's allegation that defendant acted in agreement with a sheriff's department was insufficient because "it is not enough merely to recite that there was an agreement or that defendants conspired or acted in concert, for these are *conclusions*, not f*acts*.") (emphasis in original).

Notwithstanding Mikhaila's failure to adequately allege any state action whatsoever, the Court will consider other allegations pertaining to CLC's alleged joint action with the West Point Police Department as raised in the Complaint [1]. In this regard, the Complaint [1] alleges as follows regarding the August 2024 events:

> In order to enforce the ban, an agent of Defendant CLC called the West Point Police Department. The West Point Police Department sent Sergeant FNU Nash to Defendant CLC's facility on August 23,

2024. Sergeant Nash informed Stacie Lenoir that the police department had a 'call' stating she was not supposed to be on the property and directed her to leave. As a custom of Defendant City, the order represented a West Point Police Department policy to follow the direction of business owners, such as nursing homes, regarding persons on their premises, and to enforce their rules regardless of any investigation or understanding as to why such persons are being asked to leave. Without completing an investigation, the police department directed Stacie Lenoir and her minor grandchild, PL, to leave, and to which they complied by leaving the premises.

[1] at p. 4-5.

As to these allegations, CLC argues that its "… use of police to remove an individual from private property does not automatically convert that action into state action for the purpose of the First and Fourteenth Amendments." [13] at p. 8. The Court agrees.

In *Priester*, the Fifth Circuit held that "[s]tate action will not accrue merely because of government acquiescence or approval of the private entity's actions." *Priester*, 354 F.3d at 423 (citing *Yeager v. City of McGregor*, 980 F.2d 337, 342 (5th Cir.1993)). Additionally, "'[i]t is well settled that private parties do not become state actors merely by calling upon law enforcement for assistance.'" *Payton v. Clayton*, 2024 WL 482245, at *13 (M.D. La. Jan. 5, 2024), report and recommendation adopted, 2024 WL 477526 (M.D. La. Feb. 7, 2024) (quoting *Spoon v. Bayou Bridge Pipeline, LLC*, 2020 WL 5803453, at *3 (M.D. La. Sept. 29, 2020)); *see also Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988) ("A private party does not act under color of state law when [it] merely elicits but does not join in an exercise of official state authority."); *Polacek*, 739 F. Supp. 2d at 952 (S.D. Miss. 2010) ("Courts have routinely held that a private actor does not take joint action under color of state law and thereby become liable under § 1983 merely by furnishing information to police officers who then act upon that information.") (internal quotations and citations omitted).

15

Based on the above allegations, CLC called the West Point Police Department, who in turn acted upon information provided by CLC. That is insufficient to render CLC a state actor. Additionally, the West Point Police Department's acquiescence in CLC's statement that Stacie was not supposed to be on its premises without further investigating the matter before asking her to leave does not constitute state action on the part of CLC. For these reasons, the Court finds that, even considering the above allegations, Mikhaila has alleged insufficient facts to support that CLC is a state actor for purposes of its Fourteenth Amendment claim. Nonetheless, for the same reasons provided in connection with Mikhaila's ADA claim above, the Court will permit her to attempt to cure the deficiencies identified herein when she files her amended complaint, if she desires to do so.

### III.    State Law Claims

Finally, the Court turns to Mikhaila's state law claims. Before analyzing the claims, the Court notes that CLC moves for general dismissal of Mikhaila's state law claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. It argues that, because the federal claims fail, the Court should decline to exercise supplemental jurisdiction over any remaining state law claims, which are asserted against CLC only. Though the Court has found that Mikhaila's federal claims have not been sufficiently pled as against CLC and will allow her to file an amended complaint, it notes that CLC is not the only defendant against whom federal claims are asserted. Mikhaila also brings a federal claim against the City of West Point, Mississippi, who at this juncture has not sought dismissal of the claim asserted against it. Thus, because a federal claim remains irrespective of the claims brought against CLC, the Court rejects CLC's argument. The Court moves on to address the state law claims individually. Again, those claims include breach of contract and breach of implied covenant of good faith.

16

### A. *Breach of Contract*

The Complaint [1] brings two breach of contract claims based on the express terms of the Admission Agreement. The first claim relates to the alleged visitation restrictions, and the second relates to the discharge notice. CLC argues that the Complaint [1] fails to state a claim under either theory.

The Admission Agreement contains a choice-of-law provision, which provides that Mississippi law governs the interpretation and enforcement of the agreement. *See* [1], Ex. 1 at p. 7. In Mississippi, "[a] breach-of-contract [claim] has two elements: (1) 'the existence of a valid binding contract,' and (2) a showing 'that the defendant has broken, or breached it.'" *Maness v. K & A Enter. of Miss., LLC*, 250 So. 3d 402, 414 (Miss. 2018) (quoting *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224 (Miss. 2012)). CLC does not contest that the Admission Agreement is a valid contract. Accordingly, the Court will only address the second element as to each claim.

Pertinent to Mikhaila's visitation, the Admission Agreement provides that:

> [The resident] may have visits from family members, physicians, or representatives of the Ombudsman Program at any time. Other persons may visit you during reasonable visiting hours. Exceptions may be made in certain situations.

[1], Ex. 1 at p. 6.

In her Response Memorandum [18], Mikhaila contends that the Admissions Agreement is "supplemented by" CLC's visitation policy, and CLC does not dispute that contention in its Reply [23]. [18] at p. 10.[11] The visitation policy provides as follows:

> The resident has a right to receive visitors of his or her choosing at the time of his or her choosing, subject to the resident's right to deny

---

[11] On this point, the Court notes that the Admissions Agreement generally references Mikhaila's agreement to comply with its "policies and procedures" and appears to incorporate those policies by reference. *See* [1], Ex. 1 at p. 6. CLC also cites to its policy in requesting dismissal of Mikhaila's breach of contract claim based on the visitation restrictions. *See* [13] at p. 11. Again, CLC does not, at this stage, contest that the policy terms appear to be incorporated into the Admissions Agreement.

> visitation when applicable, and in a manner that does not impose on the rights of another resident.
>
> …
>
> The facility must provide immediate access to a resident by immediate family and other relatives of the resident, subject to the resident's right to deny or withdraw consent at any time[.]

[1], Ex. 4 at p. 1.

As to these provisions, CLC argues that Mikhaila has failed to plead breach of the Admissions Agreement because it "has not denied Plaintiff the right to any and all visitors, the facility has required that Plaintiff's mother visit the facility in a manner that takes into account the needs and safety of other residents." [13] at p. 11. However, the Complaint [1] alleges that after the August 2024 incident involving Ross there were instances in which Stacie, Mikhaila's mother, was told by employees of CLC that she could visit Mikhaila only to then be turned away upon her arrival. Though the visitation provision in the Admissions Agreement contains discretionary language, the policy terms provide that CLC "*must* provide *immediate* access…" to immediate family members such as Stacie and Mikhaila's minor daughter. [1], Ex. 4 at p. 1. Viewing the facts in the light most favorable to Mikhaila, the Court finds that she has sufficiently pled facts to support a breach based on the alleged restrictions on her visitation with her mother and daughter.

Further, the Complaint [1] alleges that CLC restricted Mikhaila's visitation to business hours, between 8:00 AM and 5:00 PM. Pursuant to the visitation policy, Mikhaila had the "right" to receive visitors at the time of her choosing. *Id*. Based on these allegations of CLC's purported conduct, the Court finds that Mikhaila has alleged sufficient facts, for purposes of this stage of the proceedings, to support a breach a contract claim based on that separate provision of the policy.

Next, the Court addresses whether Mikhaila has pled sufficient facts to support a breach of the Admissions Agreement by virtue of CLC's discharge letter. In this regard, the Admissions

18

Agreement provides that CLC may transfer or discharge a resident "only for one of the… reasons" enumerated in the agreement, including if "[t]he transfer or discharge is necessary for [the resident's] welfare because [the resident's] needs cannot be met in the facility[.]" *Id.*, Ex. 1 at p. 4.

The discharge letter, which is attached to the Complaint [1], is addressed to Stacie and states that Mikhaila "has been issued a 30-day discharge" because CLC is purportedly unable to meet Mikhaila's needs as a resident of its facility. *Id.*, Ex. 5 at p. 1. The letter indicated that the effective date of the discharge would be March 30, 2025. Notably, the Complaint was filed on March 13, 2025, and does not allege that Mikhaila was in fact discharged or transferred from CLC's facility. In its Memorandum [13], CLC argues that Mikhaila is still a resident of CLC and therefore no breach has occurred as it relates to its discharge notice. For her part, Mikhaila does not respond to CLC's request for dismissal of this claim by pointing to specific facts in the Complaint [1] that otherwise support her claim. Instead, she merely argues that "Plaintiff's Complaint is detailed in pleading the facts leading up to her discharge[.]" [18] at p. 11. Again, the Complaint [1] does not allege that Mikhaila was actually transferred or discharged but only that she received a notice from CLC of its intent to do so. It is unclear to the Court which provision of the parties' agreement the discharge notice violates, and Mikhaila cites no authority in her response to support a breach based on the facts provided. Despite the Court's inclination to dismiss this breach of contract claim, it will allow Mikhaila to replead this claim supported by adequate facts, if applicable, in her amended complaint consistent with the Court's prior rulings herein.

*B. Breach of Implied Covenant of Good Faith*

Finally, Mikhaila brings a breach of contract claim based on the implied covenant of good faith relative to the Admission Agreement. In Mississippi, "[a]ll contracts contain 'an implied

covenant of good faith and fair dealing in performance and enforcement.'" *Caplinger v. Whitney Bank*, 293 So. 3d 307, 312 (Miss. Ct. App. 2020) (quoting *Univ. of S. Miss. v. Williams*, 891 So. 2d 160, 170 (Miss. 2004)). "Good faith has been defined by courts as 'the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party.'" *Id.* (quoting *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992)). "However, 'a party does not breach the implied covenant of good faith and fair dealing when the party took only those actions which were duty authorized by the contract.'" *Id*. (quoting *Martindale v. Hortman Harlow Bassi Robinson & McDaniel PLLC*, 119 So. 3d 338, 345 (Miss. Ct. App. 2012)).

The Complaint [1] alleges that "Defendant CLC is liable for damages for violation of the obligation of good faith, which is inherent in all contracts." [1] at p. 9. However, it does not allege whether this claim is based on the facts surrounding the alleged visitation restrictions or Mikhaila's receipt of CLC's discharge letter. In her Response Memorandum [18], Mikhaila merely states that the Complaint [1] alleges that CLC did not act in good faith but fails to elaborate *how* it did so. To the extent this claim is based on the visitation issue, the Court finds that Mikhaila has sufficiently pled this claim for the same reasons explained above in connection to the express breach of contract claims based on the visitation facts. Whether CLC's action in restricting Mikhaila's visitation was authorized by the Admission Agreement requires further development of the facts and is more appropriately addressed at the summary judgment stage. If this claim is based on any other fact, Mikhaila is tasked with making such clarification, if appropriate, in her amended complaint.

## *Conclusion*

For the reasons set forth above, Plaintiff is hereby ORDERED to file an amended complaint within fourteen (14) days of the date of this Order. Her failure to do so will result in dismissal of the claims that the Court is affording her the opportunity to amend, without further notice.

20

CLC's Motion to Dismiss [12] is DENIED *without prejudice*. If appropriate, CLC may re-urge its arguments after Plaintiff files an amended complaint.

SO ORDERED, this the 24th day of March, 2026.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE