IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

MIKHAILA LENOIR                                                          PLAINTIFF

v.                                              CIVIL ACTION NO. 1:25-CV-38-SA-DAS

CLC OF WEST POINT, LLC D/B/A
WEST POINT COMMUNITY LIVING CENTER
and the CITY OF WEST POINT, MISSISSIPPI                       DEFENDANTS

ORDER AND MEMORANDUM OPINION

On March 13, 2025, Mikhaila Lenoir initiated this civil action by filing her Complaint [1] against CLC of West Point, LLC d/b/a West Point Community Living Center ("CLC") and the City of West Point, Mississippi. The Complaint [1] brought claims pursuant to the Americans with Disabilities Act and the First and Fourteenth Amendments, as well as various state law claims.

CLC subsequently filed a Motion to Dismiss [12]. On March 24, 2026, the Court entered an Order [38] denying the Motion [12] and allowing Mikhaila the opportunity to amend her complaint to clarify and/or adequately set forth her claims. She then filed an Amended Complaint [44], which is now the operative complaint, on April 7, 2026. The Amended Complaint [44] brings a claim pursuant to the American with Disabilities Act and two state law claims for breach of contract and breach of implied covenant of good faith against CLC. As to the City, the Amended Complaint [44] brings a Fourteenth Amendment claim pursuant to 42 U.S.C. § 1983.

Now before the Court are CLC's Motion to Dismiss, or in the Alternative, Motion to Stay Proceeding and to Compel to Arbitration [46] and the City's Motion for Summary Judgment [53]. The Motions [46, 53] have been fully briefed and are ripe for review. Having considered the parties' filings, as well as the applicable authorities, the Court is prepared to rule.

*Factual Background*

CLC is a nursing home located in West Point, Mississippi. Mikhaila is a quadriplegic and former resident of CLC. Mikhaila's mother, Stacie Lenoir, brings this lawsuit on her behalf acting pursuant to a Power of Attorney. *See* [60], Ex. 1 at p. 2-3.

In 2022, Mikhaila was admitted as a resident of CLC with the assistance of Stacie.[1] Acting in a representative capacity, Stacie entered into an Admission Agreement with CLC on Mikhaila's behalf. The Admission Agreement states that Mikhaila "may have visits from family members, physicians, or representatives of the Ombudsman Program at any time" and that "[e]xceptions may be made in certain situations." [44], Ex. 1 at p. 6. Additionally, during the relevant time period, CLC had a visitation policy in place.

On August 4, 2024, the West Point Police Department responded to a call regarding a disturbance at CLC. According to the police report from the incident, the "complainant" was Dorothy Ross, Mikhaila's roommate. [53], Ex. 1 at p. 5. In the police report, Officer Lexus Ware describes visiting the facility and fielding complaints from Ross pertaining to Mikhaila. The report also indicates that Mikhaila complained to Officer Ware of threats Ross had made against her. A second police report states that Stacie spoke with Lieutenant John Langford of the West Point Police Department on August 9, 2024, and complained of Ross' behavior during the August 4, 2024 incident. *See id.* at p. 6. The second report also states that "[t]hey have since removed her from the room." *Id*.

Thereafter, on August 23, 2024, the West Point Police Department responded to a call regarding a trespasser at CLC. At the time of the call, Stacie and Mikhaila's minor daughter were visiting Mikhaila. When the officers arrived at the facility, an employee of CLC, Genevieve

---

[1] Mikhaila has a minor daughter who lives with and is cared for by Stacie.

2

Stallings, informed the investigating officer, Sergeant Veleeka Nash, that Mikhaila's guests (Stacie and Mikhaila's minor daughter) were not supposed to be on the CLC premises at that time. *See id.* at p. 11. According to a report that Sergeant Nash submitted to her superiors, Stallings informed Nash that the director of the facility, Rayona Deanes, had previously told Stacie that she could only go onto the property for visitation between the hours of 8:00 A.M. and 5:00 P.M. on weekdays due to a threat made against Mikhaila's former roommate.[2]

Other officers responded to the August 23, 2024 call, including Corporal Justin Livingston, Officer Kevin Camp, and Officer Alexander Newman. Bodycam footage of one of these officers was made part of the record in this case though it is unclear which officer the same corresponds to. The footage shows officers arriving at CLC and briefly entering Mikhaila's room. [53], Ex. 1, at 02:16-02:25. Sergeant Nash was already inside the room talking with Mikhaila when the other officers arrived. She is heard explaining to Mikhaila that the police department is responding to a call from CLC indicating that CLC had a trespasser at its facility who was not supposed to be there after 5:00 P.M. *Id.* at 03:21-03:50. Sergeant Nash then tells Mikhaila that, when she arrived, a staff member identified Stacie as the individual who was not supposed to be on the CLC premises after 5:00 P.M. and that Stacie had to leave. *Id.* at 03:38-03:49. She then explained to Mikhaila that the only issue she was there to address was the complaint of a trespasser. *Id.* at 04:00-04:08.

While Sergeant Nash is talking to Mikhaila, Stacie requests for Stallings to call Deanes, who, again, is the administrator of CLC. After talking to Mikhaila, Sergeant Nash approached a nursing station where Stallings, Stacie, and one of the officers were located. Stallings, who had contacted Deanes via telephone, then handed the telephone to Sergeant Nash. *Id.* at 04:35-05:13.

---

[2] According to the report, the alleged threat underlying the visitation restriction was made by Stacie and Mikhaila's sister against Mikhaila's former roommate.

3

Ultimately, the substance of Sergeant Nash's conversation via telephone with Deanes is inaudible. However, when the call ended, Sergeant Nash told Stacie that she was informed that other officers had responded to a call to the facility on a prior occasion and that documentation was submitted by the facility to the Ombudsman, the Attorney General's office, the Chancery Clerk, and the Chief of Police. *Id.* at 10:00-10:40. Based upon information provided to her by Deanes and CLC nursing staff, Sergeant Nash asked Stacie to leave and not return unless she had spoken to Deanes or called to make an appointment consistent with the parameters set by the facility. *Id.* She also advised Stacie to call Deanes ahead of returning to the property. *Id.* at 10:39-10:46. As Stacie and the officers were leaving, Sergeant Nash told Stallings that it would be up to her or Deanes to inform the patient (Mikhaila) of her rights. *Id.* 11:00-11:05. Following the August 23, 2024 interaction, Stacie submitted a complaint against Sergeant Nash to the City of West Point Police Department on August 30, 2024. *See* [53], Ex. 1 at p. 10.

According to the Amended Complaint [44], on November 22, 2024, a CLC social worker, Heather Parham, told Stacie that she could visit Mikhaila that day. However, when Stacie arrived at CLC's facility at 6:00 P.M., an employee of CLC named "Jody" told her that she would only be allowed to visit by appointment between the hours of 8:00 A.M. and 5:00 P.M. during weekdays. Stacie, who was accompanied by the minor child on this attempted visit, was directed to leave the premises and she complied.[3]

The Amended Complaint [44] alleges that Stacie's employment obligations conflict with the allowed visitation times, making it "practically impossible" for her to visit Mikhaila. [44] at p. 6. It alleges that "[e]ven when Stacie Lenoir gets advance permission, she has not been allowed to

---

[3] The Amended Complaint [44] does not provide any information about what Mikhaila's visitation schedule was prior to the August 2024 incident involving Ross or whether it was any different from what CLC informed Stacie.

4

visit." *Id*. Thereafter, on February 14, 2025, Stacie met with Deanes, Parham, and "Ombudsman Thompson" to discuss the visitation hours. *Id*. at p. 7. She was again told that she would have to visit within business hours on weekdays, as previously indicated to her, and that any visitation would be conducted only in the conference room. The Amended Complaint [44] alleges that Stacie expressed her opposition to those visitation parameters because Mikhaila is bedridden and her transfer to the conference room via wheelchair would allegedly cause her pain and potential injury.

A week later, CLC sent Stacie a letter indicating that it would be discharging Mikhaila from its facility.[4] The letter provided Stacie with a 30-day notice of the discharge with the effective date of the discharge being March 30, 2025. As for the reason for this decision, the letter stated in pertinent part:

> [CLC] is unable to give [Mikhaila] the highest optimal quality of care due to the constant refusal of care, including, but not limited to: proper wound treatment, lab work, psych evaluation, specialist referrals, pharmacy recommendations, dietary recommendations, and safety measures. Moreover, the constant actions have created a situation where the facility is unable to meet the needs and expectations of the resident.

*Id.*, Ex. 5 at p. 1.

This lawsuit followed. The Amended Complaint [44] alleges that, after Mikhaila filed the instant suit, CLC did not follow through with discharging her. Rather, it alleges that "[b]ecause of Defendant's CLC's neglect and abuse, [Mikhaila] was transferred from [CLC] to a facility in Tupelo, Mississippi, in December 2025." [44] at p. 7.

As to the West Point Police Department, the Amended Complaint [44] alleges that it violated Mikhaila's right to familial association when it caused Mikhaila's family members to leave CLC. Regarding CLC, the Amended Complaint [44] alleges that it violated the ADA by

---

[4] The effective date of the notice was February 28, 2025.

refusing to allow Mikhaila to have visitation with her mother and daughter in her own room rather than in the conference room. Again, the Amended Complaint [44] brings claims under the ADA and state law against CLC and a Fourteenth Amendment claim pursuant to Section 1983 against the City.

Through its Motion for Summary Judgment [53], the City seeks dismissal of the sole claim asserted against it. In its Motion to Dismiss [46], CLC requests dismissal of Mikhaila's ADA claim or, alternatively, for all claims asserted against it to be compelled to arbitration. Both Motions [46, 53] are opposed. The Court will address them in turn.

###### I.      *Motion for Summary Judgment [53]*

The Court first addresses the City's Motion for Summary Judgment [53], which concerns Mikhaila's associational rights claim brought pursuant to Section 1983.

###### A. *Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts

6

showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

B. *Section 1983 Generally*

"Regarding Section 1983, the United States Supreme Court has held that the statute's 'very purpose. . . was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action *under color of state law*.'" *Alexander v. McAdams*, 2017 WL 5642328, at *3 (N.D. Miss. Apr. 18, 2017) (quoting *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, 32 L. Ed. 2d 705 (1972)) (emphasis in original). "Therefore, to succeed on a Section 1983 claim, the plaintiff must demonstrate: '(1) a violation of the United States Constitution or of federal law; and (2) that the violation was committed by someone acting under color of state law.'" *Id.* (quoting *Hutton v. Shamrock Ridge Homeowners Ass'n*, 2009 WL 4796626, at *2 (N.D. Tex. Dec. 14, 2009) (in turn citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)).

"To establish municipal liability under Section 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.'" *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Monell v. Dep't of Soc. Servs.*

*of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). "A plaintiff must identify: '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom.'" *Id.* at 541-42 (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

    C.  *Associational Rights claim against the City*

Before addressing the merits of Mikhaila's claim, the Court first considers an argument raised in Mikhaila's Response Memorandum [61] pertaining to the lack of opportunity to conduct discovery in this case. She argues that "[b]ecause there has been no discovery, [she] cannot submit evidence that Defendant City has a policy of not training its officers to respect parents' visitation rights or that the police chief was the policymaker for Defendant City without obtaining discovery." [61] at p. 6. In support of this argument, Mikhaila submitted the sworn declaration of her attorney, Jim Waide, in which he attests that he "need[s] discovery to determine the role of the Chief of Police in controlling the actions of police officers for the City of West Point, as well as to investigate who has final policymaking authority for the City of West Point's Police Department." [60], Ex. 1 at p. 1.

Though it is true that the extent of the parties' discovery thus far has apparently only involved Rule 26 initial disclosures, the Court finds noteworthy the limited nature of Mikhaila's request. She argues that she needs discovery in order to respond to only one aspect of the City's basis for seeking dismissal of her Section 1983 claim—the lack of an "official municipal policy." *Valle*, 613 F.3d at 541. Notably, the City's primary argument for dismissal is that the undisputed facts do not support a constitutional violation on the part of the City because it had no intent to interfere with Mikhaila's familial relationships. Cognizant that demonstrating a constitutional violation is an element of her claim against the City, Mikhaila does substantively respond to that

portion of the City's Motion [53]. *See* [61] at p. 5. It follows that she does *not* argue that she needs discovery in order to effectively oppose that portion of the City's Motion [53], and her attorney's sworn declaration does not address it. In light of this, the Court declines to deny the City's Motion [53] solely because Mikhaila requests an opportunity to conduct discovery on a narrow issue that touches only one aspect of her claim. Thus, the Court will first analyze the other aspect of her claim—specifically, whether she has shown the existence of a constitutional violation as required to prove her Section 1983 claim.

Again, Mikhaila asserts that the City violated her right to familial association. "According to Supreme Court precedent, the Constitution accords special protection to two different types of association, 'intimate association' and 'expressive association.'" *Kipps v. Caillier*, 205 F.3d 203, 204-05 (5th Cir. 2000) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)) (additional citations omitted). "In *Roberts*, the Court noted that the right to intimate association, the freedom to choose 'to enter into and maintain certain intimate human relationships,' is a 'fundamental element of personal liberty.'" *Id.* (quoting *Roberts*, 468 U.S. at 617-18, 104 S. Ct. 3244). As such, "[t]he right to familial association or family integrity is a form of liberty guaranteed by the due process clause of the Fourteenth Amendment." *In Int. of N.L.P.*, 2018 WL 2670416, at *4 (E.D. Tex. May 3, 2018), report and recommendation adopted, 2018 WL 2548009 (E.D. Tex. June 3, 2018) (quoting *Doe v. Dallas Indep. Sch. Dist.*, 194 F. Supp. 3d 551, 564 (N.D. Tex. 2016)) (in turn quoting *Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir. 1999)) (internal quotation marks omitted).

"Although the contours of this right have been described as 'nebulous and undefined,' *Rolen v. City of Brownfield, Tex.*, it is perhaps best defined as 'the right of the family to remain together without the coercive interference of the awesome power of the state.'" *Id.* (quoting *Doe*,

9

194 F. Supp. 3d at 564) (internal citations omitted). "To state a claim for deprivation of [her] right to familial association under the Fourteenth Amendment, a plaintiff must generally demonstrate that some 'state action (or inaction) physically separates family members from one another.'" *Id.* at *5 (quoting *Doe*, 194 F. Supp. 3d at 564). "Only state action that *purposefully* interferes with the family relationship rises to the level of a due process violation." *Id*. (internal quotation marks and citations omitted; emphasis added). "Thus, 'not every statement or act that results in an interference with the rights of familial association is actionable. The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship.'" *Id.* (quoting *Lowery v. City of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008)).

The Court first clarifies the basis for Mikhaila's claim that the City violated her right to familial association. According to the Amended Complaint [44], the "Defendant City of West Point, Mississippi, violated Plaintiff's substantive Fourteenth Amendment right to due process by assisting Defendant CLC, and by itself, causing Plaintiff's family visitors to be removed from the Defendant CLC's facility." [44] at p. 9. It is undisputed that Sergeant Nash, along with other officers, responded to a call regarding a trespasser at CLC, who was later identified as Stacie, on August 23, 2024. Other than that instance, Mikhaila does not, in her Response Memorandum [61], identify any other incident that forms the basis for her claim. In fact, in its Memorandum [54], the City acknowledges that Mikhaila's claims arise from a single interaction involving the West Point Police Department on August 23, 2024, and Mikhaila does not counter that assertion. Having made that clarification out of an abundance of caution, the Court turns to the parties' arguments.

In its Memorandum [54], the City argues that the claim fails because the City's officers "never purposefully interfered with Plaintiff and her relationship with her family—the City simply

responded to a complaint for trespassing after receiving prior reports of disturbing the peace." [54] at p. 5. Importantly, in her Response Memorandum [61], Mikhaila does not point to any evidence in the record which indicates that the officers intended to interfere with Mikhaila's relationship with her mother and daughter in asking Stacie to leave the CLC premises on the date in question. In response, she merely argues that "the question of a party's intent is a question of fact for the jury" without citing any portion of the record or authority in support. [61] at p. 5. The Court finds her response insufficient to overcome summary judgment on this claim.

Notwithstanding that finding, in *Singletary*, the Fifth Circuit held that "[a] defendant can be held liable for violating the right of intimate association only if the plaintiff shows an *intent to interfere* with the relationship." *Singletary v. Brumley*, 1998 WL 546515, at *7 (5th Cir. 1998) (quoting *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1440 (10th Cir.1990)) (emphasis in original).[5] The undisputed record shows that the West Point Police Department responded to CLC's call on August 23, 2024, to address an issue pertaining to an alleged trespasser. Again, it is undisputed that the alleged trespasser was identified by CLC staff as being Stacie and that information in that regard was provided to Sergeant Nash upon her arrival. In support of its

---

[5] Though an unpublished decision, the Court finds *Singletary* persuasive absent any other Fifth Circuit decision establishing the appropriate legal standard under which to evaluate this claim. Furthermore, the Court notes that most circuits that have ruled on issues surrounding this claim have "… allow[ed] plaintiffs to maintain a cause of action only when defendants have intentionally interfered with the familial relationship." *Green v. Fewell*, 2005 WL 8174212, at *3 (W.D. La. Sept. 26, 2005). Most recently, district courts within the Fifth Circuit, relying on the Tenth Circuit's decision in *Trujillo v. Bd. of Cnty. Comm'rs*, 768 F.2d 1186 (10th Cir. 1985), have applied the same standard set forth in *Singletary. See Cervantez v. Love*, 2024 WL 2967336, at *18 (N.D. Tex. June 12, 2024) (explaining that in order to prove a "deprivation-of-familial-relationships claim… courts have required that the challenged state action be specifically intended to interfere with a particular relationship protected by the freedom of intimate association") (internal quotation marks and citations omitted); *Williams v. Bolin*, 694 F. Supp. 3d 904, 915 (S.D. Tex. 2023) ("District courts within this circuit to address this issue appear to agree that a plaintiff making such a claim must plead that the alleged interference was intentional."); *Kramer v. Belong/Sjrc Texas*, 2026 WL 1269847, at *2 (S.D. Tex. May 8, 2026) ("To state a claim for deprivation of her right to familial association, Plaintiff must generally allege an intentional state action that interferes with her family relationships"). Mikhaila does not disagree that this standard is applicable to her claim in her Response Memorandum [61].

11

argument for dismissal, CLC points to the provided bodycam footage, which demonstrates that Sergeant Nash never told Stacie that she was banned from visiting Mikhaila at the facility. Rather, Sergeant Nash is heard telling Stacie that she needs to call and speak with Deanes or arrange an appointment for visitation during the hours indicated by the facility before returning to the premises. [53], Ex. 1, at 10:00-10:40. The Court finds that no clear physical separation of Mikhaila from her family has been established, much less an intentional interference targeting her familial relationships as required to prove this claim. *See In Int. of N.L.P.*, 2018 WL 2670416 at *4; *see also Singletary*, 1998 WL 546515 at *7.

As CLC points out, it is undisputed that at all times during Sergeant Nash's interaction with Stacie, Mikhaila's minor child physically remained with Stacie, and neither of them were taken into custody. Additionally, the Court notes that there is no evidence in the record that indicates Sergeant Nash was aware that Stacie's work schedule conflicted with the parameters CLC had set for Stacie's visitation with Mikhaila. In the Court's view, Sergeant Nash's actions were consistent with her expressed intent of investigating an alleged trespasser on CLC's premises and resolving that dispute. In sum, the Amended Complaint [44] does not allege, and the evidence does not show, that she asked Stacie to leave CLC with the intent to interfere with Mikhaila's familial relationships. This claim is due to be dismissed.[6]

II.      *CLC's Motion to Dismiss [46]*

The Court now turns to CLC's Motion to Dismiss [46]. Through its present Motion [46], CLC seeks dismissal of Mikhaila's ADA claim on Rule 12(b)(6) grounds. Alternatively, it seeks to compel all of Mikhaila's claims against it to arbitration.

---

[6] Because Mikhaila's Section 1983 claim against the City fails based on the first element, the Court need not address the parties' arguments pertaining to the City's official municipal policy, or lack thereof, as the outcome would be unaffected.

Though requested in the alternative, this Court must first resolve whether the claims asserted against CLC are subject to arbitration before it can reach the merits of Mikhaila's ADA claim. *See Odom Indus., Inc. v. Sipcam Agro Sols., L.L.C.*, 2025 WL 1576800, at *2 (5th Cir. June 4, 2025) ("[A] district court typically must resolve a motion to compel arbitration before taking other action in a case.") (collecting cases); *see also Educ. Mgmt. Servs., L.L.C. v. Slaikeu*, 2014 WL 12586408, at *8 (W.D. Tex. May 23, 2014), report and recommendation adopted, 2014 WL 12586779 (W.D. Tex. June 12, 2014) ("It is well-settled in the Fifth Circuit that when a trial court is presented concurrently with a motion to dismiss and a motion to compel arbitration, the court first should consider the motion to compel arbitration.").

"'[T]he Fifth Circuit has never discussed the appropriate standard for a district court to apply when considering a motion to stay or compel arbitration.'" *Nida v. Tactical Force, LLC*, 2025 WL 969247, at *2 (S.D. Miss. Mar. 31, 2025) (quoting *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 2010 WL 148292, at *3 (E.D. La. Jan. 11, 2010)). But, "'[t]he majority of other circuits apply a summary judgment-like standard, giving deference to the claims of the non-movant.'" *Id.* (quoting *ConocoPhillips Co.*, 2010 WL 148292 at *3). "District courts in this circuit have also considered motions to compel arbitration under the summary judgment standard." *Johnson v. CMI Grp.*, 2020 WL 8461518, *3 (N.D. Tex. Dec. 29, 2020) (collecting cases); *see also Nida*, 2025 WL 969247 at *2; *Kidd v. Lowe's Home Centers, LLC*, 2020 WL 9258481, at *3 (S.D. Miss. Dec. 2, 2020).

To determine whether Mikhaila and CLC have agreed to arbitrate their claims, the Court considers "'(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.'" *Auto Parts Mfg. Mississippi, Inc. v. King Const. of Houston, L.L.C.*, 782 F.3d 186, 196-97 (5th Cir. 2015) (quoting

13

*Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 392 (5th Cir. 2002)). In her Response Memorandum [57], Mikhaila does not contest the second prong but appears to take issue with the first, arguing that the Admission Agreement, which contains an arbitration provision, is unsigned. *See* [57] at p. 6. She also argues that CLC has waived any right to arbitration by virtue of its "extensive participation in [this] litigation." *Id.* at p. 5. The Court first considers whether the arbitration provision within the unsigned Admissions Agreement is a valid agreement between these parties to arbitrate Mikhaila's claims against CLC.

Important to the issue presented, "[a]lthough there is a strong federal policy favoring arbitration, it 'does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.'" *Lower, LLC v. Amcap Mortg., Ltd.*, 2024 WL 2784326, at *4 (E.D. Tex. May 30, 2024) (quoting *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 516 n.5 (5th Cir. 2019)); *see also Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012). This is the case because the Federal Arbitration Act ("FAA") "'does not require parties to arbitrate when they have not agreed to do so.'" *Lower, LLC*, 2024 WL 2784326 at *4 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989)). "To determine whether an agreement to arbitrate is valid, courts apply 'ordinary state-law principles that govern the formation of contracts.'" *Carey*, 669 F.3d at 205 (quoting *Morrison v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008)). There is no dispute that Mississippi contract law governs the Court's inquiry. *See* [44], Ex. 1 at p. 7.

Pursuant to Mississippi law, "[t]he burden of establishing the existence of an arbitration agreement, in line with the burden of establishing the existence of a contract, rests on the party seeking to invoke it." *Wellness, Inc. v. Pearl River Cnty. Hosp.*, 178 So. 3d 1287, 1292 (Miss. 2015). In Mississippi, "[a]n agreement must include the following elements to be a valid contract:

14

'(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation.'" *JP&G LLC v. Voss*, 331 So. 3d 569, 579 (Miss. Ct. App. 2021) (quoting *Grenada Living Ctr. LLC v. Coleman*, 961 So. 2d 33, 37 (Miss. 2007)).

Notably, in seeking to compel arbitration, CLC fails to argue that the Admission Agreement meets all elements of a valid contract rendering the arbitration provision enforceable. Instead, it argues that the Admission Agreement is not unconscionable—a contract defense that Mikhaila does not raise.[7] As Mikhaila points out, a cursory review of the Admission Agreement reveals that it was only signed by a representative of CLC and *not* by Stacie, Mikhaila's attorney-in-fact. *See* [44], Ex. 1 at p. 9. This places the element of mutual assent at issue.

"The mutual assent of each of the contracting parties to the terms of the contract is essential to the formation of a valid contract and is determined by considering whether the parties mutually agreed to the terms offered and accepted." *Voss*, 331 So. 3d at 579. "Mutual assent is often evidenced by a written contract signed by all parties." *Banks v. Cavalier Homes, Inc.*, 2024 WL 1315859, at *5 (N.D. Miss. Mar. 27, 2024) (internal quotation marks and citations omitted). In its Memorandum [47], CLC erroneously avers that "the gist of the Admission Agreement is obviously that, *by signing the agreement*, the parties are… agreeing to arbitrate any claims which may arise." [47] at p. 15 (emphasis added). But, again, Stacie did *not* sign the Admission Agreement. *See* [44], Ex. 1 at p. 9. Thus, absent her signature on the Admission Agreement, CLC fails to show that she assented to the arbitration provision located just one page before the signature block. *See* [44], Ex. 1 at p. 8-9. The Court notes that CLC does not argue that Stacie otherwise assented to the

---

[7] *See LAGB, LLC v. Total Merch. Servs., Inc.*, 284 So. 3d 720, 727 (Miss. 2019) (discussing procedural and substantive unconscionability and explaining that "[t]he party opposing arbitration bears the burden of proving that a contract defense applies in the particular case.").

arbitration provision. Also, after Mikhaila raised the issue in her Response Memorandum [57], CLC did not address it in its Reply [59], and the Court finds that, in failing to do so, it has effectively waived the issue. *See Nida*, 2025 WL 969247 at \*2 ("The Fifth Circuit has long held that issues not sufficiently briefed are waived.") (citing *Grimes v. Santander Consumer USA*, 2023 WL 5022276, at \*5 n.6 (N.D. Tex. July 13, 2023)) (in turn citing *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001)).

In short, the Court finds that CLC has not met its burden of establishing the existence of an arbitration agreement.[8] Having found that Mikhaila's claims are not subject to arbitration, the Court turns to the issue of whether her ADA claim survives a Rule 12(b)(6) inquiry.

### A. Dismissal Standard

Rule 12(b)(6) allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, 129 S. Ct. 1937.

A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F. 3d 228, 232–33 (5th Cir. 2009). But a court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678–79, 129 S. Ct. 1937. If there are insufficient factual allegations to raise a right to

---

[8] In light of this ruling, the Court does not reach the waiver of arbitration issue as the outcome would remain unchanged.

relief above the speculative level, the claim must be dismissed. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955.

B. *ADA Claim*

The Amended Complaint [44] alleges that CLC refused to accommodate Mikhaila's disability when it required her visitations to take place in the facility's conference room rather than in her private room. *See* [44] at p. 8.

"The ADA prohibits discrimination against persons with disabilities in three, broad sectors: employment, addressed in Title I of the statute; public services, programs, and activities, addressed in Title II; and public accommodations, addressed in Title III." *Hanks v. Olivarez*, 2019 WL 13472193, at *5 (N.D. Tex. May 24, 2019) (citing *Tennessee v. Lane*, 541 U.S. 509, 516-17, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004)). Mikhaila's claim is brought under Title III of the ADA.

"Title III of the ADA provides that 'no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.'" *George v. Hobby Lobby Stores, Inc.*, 769 F. Supp. 3d 537, 545 (E.D. La. 2025) (quoting 42 U.S.C. § 12182(a)). Under this title, discrimination, as defined by the statute, includes:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

*Id.* (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

Critically, "[r]emedies available under Title III of the ADA are the same as those under Title II of the Civil Rights Act[] of 1964, 42 U.S.C. § 2000, for which there is only injunctive relief." *Kasilus v. Astor Crowne Plaza LLC*, 2021 WL 2018076, at *2 (E.D. La. May 20, 2021) (quoting *Frame v. City of Arlington*, 616 F.3d 476, 489 (5th Cir. 2010) (in turn citing 42 U.S.C. § 12188(a)) (internal quotation marks and additional citations omitted). "Thus, compensatory damages are not available to individuals for claims under Title III of the ADA." *Id.*

In its supporting Memorandum [47], CLC argues, among other things, that this claim should be dismissed because the Amended Complaint [44] does not seek injunctive relief. On this point, the Court notes that Mikhaila initially sought injunctive relief against CLC in her original Complaint [1]; however, the Amended Complaint [44] only seeks monetary damages, which, as CLC points out, are unavailable under applicable law. Accordingly, the Court finds that this claim is subject to dismissal for this reason alone. *See Stuart v. Forest Animal Hosp.*, 2012 WL 12915408, at *1 (S.D. Miss. Sept. 4, 2012) (dismissing ADA claim and explaining that the defendant "correctly maintain[ed] that plaintiff's putative ADA claim fails because Title III of the ADA… limits the remedy of a private claim to injunctive relief and plaintiff's only claim is for compensatory damages."); *Kasilus v. Astor Crowne Plaza LLC*, 2021 WL 2018076, at *3 (E.D. La. May 20, 2021) (granting summary judgment on plaintiff's ADA claim brought under Title III partially because she only sought to recover monetary damages, which were not available); *Humes v. Walmart*, 2024 WL 1839292, at *3 (N.D. Tex. Apr. 2, 2024), report and recommendation adopted, 2024 WL 1837981 (N.D. Tex. Apr. 26, 2024) (same).[9]

---

[9] In response, Mikhaila passingly argues that the claim may still be adjudicated because she requests attorney's fees, which are available under the ADA to a prevailing party. This argument misses the mark. Because Mikhaila's requested relief is not afforded under law, her claim is subject to dismissal rendering her request for attorney's fees moot.

18

Further, though neither party raises any argument in this regard, the Court finds that, even if Mikhaila sought injunctive relief pertaining to her visitation, any such claim would be moot as the Amended Complaint [44] states that she no longer resides at CLC due to alleged abuse and neglect she experienced in December 2025. In sum, the Amended Complaint [44] sets forth no alternative basis for relief under Title III of the ADA. As such, this claim is due to be dismissed.

### C. Remaining claims

The remaining claims include state law claims for breach of contract and breach of implied covenant of good faith against CLC.

The Amended Complaint [44] premises jurisdiction based on 28 U.S.C. § 1331 (federal question). It brings only two federal claims—the Section 1983 claim against the City and an ADA claim against CLC. Having dismissed both of these claims, the Court exercises its discretion to decline supplemental jurisdiction over the remaining state law claims. *See Johnston v. Dexel*, 373 F. Supp. 3d 764, 775 (S.D. Tex. 2019) (quoting *Heggemeier v. Caldwell Cnty., Texas*, 826 F.3d 861, 872 (5th Cir. 2016) ("Generally, a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial.") (internal quotation marks omitted); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if… the district court has dismissed all claims over which it has original jurisdiction[.]").

In reaching this conclusion, the Court notes that compelling reasons for declining jurisdiction exist. *See* 28 U.S.C. § 1367(c)(4). First, the Court notes that the parties have engaged in minimal discovery and this litigation, as it concerns the state law claims, is postured in its early stages. In total, this case has been pending in federal court for just over one year, and the docket

19

does not reveal an excessive number of filings. Second, in her Amended Complaint [44], Mikhaila makes the following assertion, which the Court finds noteworthy:

> Plaintiff's counsel has just obtained Plaintiff's voluminous medical records and is attempting to obtain an attorney who specializes in nursing home litigation to determine whether Plaintiff should request leave to file a supplemental complaint based on a theory of negligence.

[44] at p. 8.

As of this date, Mikhaila has not sought any relief to amend her complaint in order to assert an additional state law claim against CLC for negligence. Proceeding with her state law claims in state court appears convenient to her and judicial economy certainly favors that result. Stated simply, the Court sees no need to depart from the general rule of declining to exercise supplemental jurisdiction in this circumstance. *See Johnston*, 373 F. Supp. 3d at 775.

*Conclusion*

For the reasons set forth above, the City's Motion for Summary Judgment [53] is hereby GRANTED. Mikhaila's Section 1983 claim against the City is dismissed *with prejudice*. CLC's Motion to Dismiss, or in the Alternative, Motion to Stay Proceeding and to Compel to Arbitration [46] is hereby GRANTED IN PART and DENIED IN PART. Mikhaila's ADA claim against CLC is DISMISSED *without prejudice*. The remaining state law claims asserted against CLC are hereby DISMISSED *without prejudice* for lack of subject matter jurisdiction. This CASE is CLOSED.

SO ORDERED, this the 28th day of July, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE

20